```
                                      ┌─────────────────────────┐
                                      │ USDC SDNY               │
                                      │ DOCUMENT                │
                                      │ ELECTRONICALLY FILED    │
UNITED STATES DISTRICT COURT          │ DOC #: _____    │
SOUTHERN DISTRICT OF NEW YORK         │ DATE FILED: 9/29/09     │
                                      └─────────────────────────┘
```

```
------------------------------------X
IXE BANCO, S.A., Institucion de     :    07 Cv. 0432 (LAP)
Banca Multiple, a Mexican           :
Corporation, and IXE GRUPO          :
FINANCIERO, a Mexican Corporation,  :
                                    :
                  Plaintiffs,       :
                                    :
          -against-                 :    MEMORANDUM
                                    :    and ORDER
MBNA America Bank, N.A., MBNA        :
CORPORATION, a Maryland             :
Corporation, and BANK OF AMERICA    :
CORPORATION, a Delaware             :
Corporation,                        :
                                    :
                  Defendants.       :
------------------------------------X
```

LORETTA A. PRESKA, Chief United States District Judge:

This action arises from Defendant MBNA America Bank, N.A.'s ("MBNA") allegedly unlawful termination of a Joint Venture Agreement (the "Agreement") with Plaintiffs Ixe Banco, S.A. and Ixe Grupo Financiero (collectively, "Ixe Banco") for the joint marketing of credit products in Mexico.[1]  Ixe Banco claims that MBNA breached the Agreement by preventing Ixe Banco from timely obtaining certain Mexican regulatory approvals.  Both parties now move for

---

[1] By Order dated March 7, 2008, the Court dismissed Ixe Banco's claims against the other defendants referenced in the caption to this action. Ixe Banco v. MBNA America Bank, No. 07 Civ. 0432(LAP), 2008 WL 650403 at * 13 (S.D.N.Y. March 7, 2008) (hereafter cited as "Ixe I").

1

summary judgment on liability with respect to this claim.

Because genuine issues of material fact remain, the motions

are DENIED.[2]

_____

[2] The parties have made the following submissions with
regard to their respective motions: Rule 56.1 Statement of
Undisputed Facts in Support of Plaintiffs' Motion for
Summary Judgment on the Issue of Defendants' Preventing
Plaintiffs from Obtaining Mexican Regulatory Approval ("Pl.
56.1 Stmt."); Memorandum of Law in Support of Plaintiffs'
Motion for Summary Judgment on the Issue of Defendants'
Preventing Plaintiffs from Obtaining Mexican Regulatory
Approval ("Pl. Mem."); Declaration of Stephen P. Younger in
Support of Plaintiffs' Motion for Summary Judgment on the
Issue of Defendants' Preventing Plaintiffs from Obtaining
Mexican Regulatory Approval, sworn to February 6, 2009
("Younger Decl."); Defendant MBNA's Response and
Counterstatement to Plaintiffs' Rule 56.1 Statement of
Undisputed Facts Pursuant to Local Rule 56.1 ("Def. Counter
56.1 Stmt."); Memorandum of Law in Opposition to
Plaintiffs' Motion for Summary Judgment ("Def. Opp. Mem.");
Declaration of Catherine L. Luzio, sworn to February 25,
2009 ("Luzio Decl."); Declaration of Louis B. Kimmelman in
Support of Defendant MBNA's Opposition to Plaintiff's
Motion for Summary Judgment, sworn to February 29, 2009
("Kimmelman Opp. Decl."); Reply Memorandum of Law in
Support of Plaintiffs' Motion for Summary Judgment on the
Issue of Defendant's Preventing Plaintiffs from Obtaining
Mexican Regulatory Approval ("Pl. Reply Mem."); Reply
Declaration of Stephen P. Younger in Support of Plaintiffs'
Motion for Summary Judgment on the Issue of Defendant's
Preventing Plaintiffs from Obtaining Mexican Regulatory
Approval, sworn to March 13, 2009 ("Younger Reply. Decl.");
Defendant MBNA's Rule 56.1 Statement of Undisputed Facts in
Support of its Motion for Summary Judgment ("Def. 56.1
Stmt."); Memorandum of Law in Support of Defendant's Motion
for Summary Judgment ("Def. Mem."); Declaration of Louis B.
Kimmelman in Support of Defendant MBNA's Motion for Summary
Judgment, sworn to February 6, 2009 ("Kimmelman Decl.");
Declaration of Patrick S. Antrim in Support of Defendant
MBNA's Motion for Summary Judgment, sworn to February 5,
2009 ("Antrim Decl."); Plaintiff's Counter-Statement

(cont'd on next page)

I.    BACKGROUND

    A.    Factual

    Plaintiff's factual allegations were detailed in this

Court's prior decision granting in part and denying in part

Defendant's motion to dismiss, familiarity with which is

assumed.  Accordingly this section recounts only those

facts germane to the instant motions.  Unless otherwise

indicated, the following recitation is undisputed.

    On April 28, 2005, MBNA and Ixe Banco entered into the

Agreement for the purpose of creating on the Closing Date a

joint venture that would issue and service credit cards and

consumer loans in Mexico. (Def. Counter 56.1 Stmt. ¶ 1; Pl.

---

(cont'd from previous page)

Pursuant to Local Rule 56.1 in Opposition to MBNA's Motion
for Summary Judgment ("Pl. Counter 56.1 Stmt.");
Plaintiffs' Memorandum of Law in Opposition to Defendant
MBNA's Motion for Summary Judgment on the Issue of
Defendant's Preventing Plaintiffs from Obtaining Mexican
Regulatory Approval ("Pl. Opp. Mem."); Declaration of
Stephen P. Younger in Opposition to Defendant MBNA's Motion
for Summary Judgment on the Issue of Defendant's Preventing
Plaintiffs from Obtaining Mexican Regulatory Approval,
sworn to February 27, 2009 ("Younger Opp. Decl.");
Defendant MBNA's Response to Plaintiffs' Additional Facts
in Plaintiffs' Counter-Statement Pursuant to Local Rule
56.1 ("Def. Add'l 56.1 Stmt."); Defendant MBNA's Reply
Memorandum of Law in Further Support of its Motion for
Summary Judgment ("Def. Reply Mem."); Reply Declaration of
Catherine L. Luzio, sworn to March 12, 2009 ("Luzio Reply
Decl."); Declaration of Louis B. Kimmelman in Further
Support of Defendant MBNA's Motion for Summary Judgment.
Sworn to March 13, 2009 ("Kimmelman Reply Decl.").

Counter 56.1 Stmt. ¶ 8.) The Agreement defined the Closing Date as "the date, not to exceed June 30th, 2005 (or such other date as may be mutually agreed by the parties hereto), on which the conditions specified in section 3 are met." (Younger Decl. Ex. 1, (hereafter "Agmt.") ¶ 1 (19).) Section 3(a) of the Agreement included five conditions precedent for the closing, one of which was "receipt of all Government Approvals in form and substance reasonably satisfactory to Ixe Banco and MBNA."[3] (Id. ¶ 3(a)(ii).)

---

[3] In its entirety, Section 3(a) of the Agreement provides:

(a) Conditions Precedent and Closing Deliverables. This Agreement is subject to the completion, on or before the Closing Date, to the reasonable satisfaction of Ixe Banco and MBNA, of the following conditions precedent:

(i) Each of the Transaction Documents (other than this Agreement) shall have been executed in form and substance satisfactory to each party hereto, and shall have become effective in accordance with the respective terms thereof;

(ii) receipt of all Government Approvals in the form and substance reasonably satisfactory to Ixe Banco and MBNA;

(iii) receipt by each party of copies of resolutions of the Board of Directors, shareholders or other corporate authority of the other party and, if applicable, its Designee, approving the execution and delivery of this Agreement and the other Transaction Documents to which each is a party and the transaction contemplated hereunder and thereunder;

(cont'd on next page)

4

Government Approvals were defined as "any regulatory approvals in Mexico and the United States. . . required in connection with the Transaction Documents," including, with respect to Ixe Banco, authorization from the Mexican Ministry of Finance ("Hacienda") and "express or tacit approvals" from the Mexican Competition Commission and Foreign Investment Bureau ("FIB"). (Id. ¶ 1(a)(38).)  Under this provision, MBNA was to obtain the approval of the Board of Governors of the Federal Reserve System of the United States (the "Federal Reserve"). (Id.)

The parties further agreed that each would provide the other "with the necessary information and documentation so that Ixe Banco can apply for the Mexican Governmental Approvals and MBNA can apply for the Governmental Approvals required in the United States." (Id. ¶ 4(b).)  In this regard, the parties agreed to consult with each other "prior to making any filing with any authority," inform each other "about any request or comment by any authority," use "commercially reasonable best efforts to make the

---

(cont'd from previous page)

> (iv) delivery of the Closing Certificates; and
>
> (v) the Operating Agreement, the Ixe MBNA Sofol By-laws and the Ancillary Subsidiary By-laws shall each have become effective.

(Agmt. ¶ 3(a).)

required filings as soon as practicable," and "diligently pursue the Government Approvals Corresponding to each." (Id. ¶ 4(b)(i)-(iv).)  Section 3 of the Agreement also listed certain actions to be taken on the Closing Date, the first of which was the formation of Ixe MBNA International ("the LLC"), a Delaware Limited Liability Corporation through which each party would invest via "one or more . . . Designees" in the venture. (Id. ¶¶ 2(a), 3(b)(i); Luzio Decl. ¶ 11.)  The Agreement specifically required Ixe Banco to obtain authorization from Hacienda to provide fifty percent of the capital for the LLC. (Agmt. ¶ 4(a)(1).)  The LLC, in turn, was to form and capitalize Ixe MBNA Sofol (the "Sofol"), a Mexican limited scope financial institution that was to purchase Ixe Banco's existing credit card business. (See id. ¶ 2(b)-(c); Luzio Decl. ¶ 11; Pl. Counter 56.1 Stmt. ¶ 14.)

The Agreement also included a provision whereby the Agreement would terminate upon "the election of any party after June 30th, 2005 (or such later date as may be agreed by the parties), in the event that the Closing Date shall not have occurred by that date." (Agmt. ¶ 13(a)(i).)

On June 9, 2005, MBNA obtained approval from the Federal Reserve to establish MBNA International Investment

Corporation (the "MBNA Edge")[4] with initial capital in the
amount of $5 million and use it to invest up to $30 million
in the LLC, which would in turn contribute up to $60
million to the Sofol. (See Luzio Decl. Ex. B; Def. Counter
56.1 Stmt. ¶ 12.)  Subsequently, on June 30, 2005, MBNA
Corporation announced that it had entered into a merger
agreement with Bank of America ("BOA"). (See Pl. Counter
56.1 Stmt. ¶ 26.)  The merger became effective in January
of 2006. (Def. 56.1 Stmt. ¶ 4.)

Although the transaction contemplated in the Agreement
did not close on or before June 30, 2005, neither Ixe Banco
nor MBNA exercised its right to terminate at this time.
(See Pl. Counter 56.1 Stmt. ¶ 25.)  Rather, on October 27,
2005, they amended the Agreement (the "Amendment") to
redefine the Closing Date as "the date, not to exceed March
31st, 2006 (or such other date as may be mutually agreed by
the parties hereto, on which the conditions specified in
Section 3 are met."[5] (Younger Decl. Ex. 2.)  Email
correspondence indicates that at this time, MBNA still

---

[4] An Edge Act corporation is a corporation that is organized
under the laws of the United States "for the purpose of
engaging in international or foreign banking or other
international or foreign financial operations." Bank of Am.
Corp. v. Lembruger, 385 F. Supp. 2d 200, 207 n.5 (S.D.N.Y.
2005) (quoting 12 U.S.C. § 611).

[5] Under the plain language of the Agreement, MBNA retained
to right to terminate because the termination clause was
not altered by the Amendment. Ixe I at * 7.

intended to use the MBNA Edge to fund its investment in the venture and thought it would take three to four months for Ixe Banco to obtain the required Mexican Government Approvals. (Def. Counter 56.1 Stmt. ¶¶ 18-19.)

On November 24, 2005, Ixe Banco made an informal submission to Hacienda to elicit comments on its proposed investment in the LLC.[6] (Def. Counter 56.1 Stmt. ¶ 23.) This informal submission included an explicit statement that the investment would be made jointly with the MBNA Edge, as well as the Federal Reserve approval referencing the MBNA Edge. (Younger Decl. Ex. 7.)

On January 12, 2006, T.T. Badrinath, BOA's chief operating officer for Latin America, proposed to Catherine Luzio, an MBNA employee charged with coordinating regulatory efforts for the venture, that MBNA should fund the LLC via BankAmerica International Financial Corporation (the "BOA Edge") rather than the MBNA edge. (See Pl, Counter 56.1 Stmt. ¶ 18; Def. Counter 56.1 Stmt. ¶ 32; Luzio Decl. ¶ 19.)  As discussed infra, the parties dispute whether and when Ixe Banco was informed of this development.

---

[6] Hacienda's approval process generally requires the applicant to make such submissions until notified that a formal submission seeking final approval is appropriate. (Def. Counter 56.1 Stmt. ¶ 14.)

The following day, Luzio and Ixe Banco personnel met with the Director General of Hacienda to discuss the proposed Joint Venture. (Def. Counter 56.1 ¶ Stmt. 25.) Luzio's notes reflect that Hacienda was "happy w/ package, few comments; excited about venture; work well w/IXE, good relationship; sure this will be a great success." (Younger Decl. Ex. 8.) However, her notes also indicate a "need [for] more clarification on entities" involved in the transaction. Id.

Ixe Banco made a second informal submission to Hacienda on February 3, 2006. Like its November submission, this included a letter referencing the investment by the MBNA Edge and the June 9, 2005 Federal Reserve approval. (Def. Counter 56.1 Stmt. ¶ 28.)

Around this time, Luzio "started the process of identifying the steps that needed to be taken to obtain [BOA] internal approval for the use of [the BOA Edge] and its funds." (Luzio Decl. ¶ 20; Pl. 56.1 Stmt. ¶ 41.) The BOA Edge's board of directors was formally asked to approve that entity's participation in the joint venture on March 15, 2006. (Def. Counter 56.1 Stmt. ¶ 48.) Prior to that date, MBNA provided Ixe Banco with no documentation on the BOA Edge. (Id. ¶ 50.)

Ixe Banco contends, and MBNA disputes, that it was not informed before mid-March that the BOA Edge would replace the MBNA Edge. (Id. ¶ 43.)  Ixe Banco further asserts, and MBNA also disputes, that it then told MBNA that "in terms of the application [for regulatory approval], this [was] like starting from scratch." (Id. ¶ 44.)  Nonetheless, on March 23, 2006, Badrinath wrote an email to Javier Molinar, Chief Executive Officer of Ixe Banco, indicating that he was looking forward to starting the joint venture contemplated by the Agreement. (Id. ¶ 54.)

Ixe Banco made a third informal submission to Hacienda on March 28, 2006. (Pl. Counter 56.1 Stmt. ¶ 57.)  This was the first time its submissions referenced the BOA Edge. (Id.)  Ixe Banco made no filings with either the Competition Commission or the FIB. (Id. at ¶ 58.)  Nor had several agreements necessary for closing, including the Operating Agreement, the Transfer Agreement by which the Sofol would acquire Ixe Banco's existing credit card portfolio, the Ixe Banco Services Agreement, and the MBNA Secondment Agreement been completed by March 31, 2006, the Closing Date specified in the Amendment. (Id. 56.1 Stmt. ¶¶ 66-67.)

As of April 2, 2006, MBNA was drafting another amendment to the Agreement further extending the closing

date. (Def. Counter 56.1 Stmt. ¶ 61.)   However, on April 7,
Badrinath circulated an internal email within BOA and MBNA
indicating that BOA intended to terminate the Agreement.
(Id. ¶ 64.)   On April 21, 2006, BOA sent a letter to Ixe
Banco indicating its election to terminate the Agreement
pursuant to Section 13(a)(i), which authorized termination
by either party in the event the Closing Date did not occur
by June 30, 2005. (Pl. Counter 56.1 Stmt. ¶ 73.)

    B.   Procedural

Plaintiffs originally asserted eight claims under New
York law against MBNA, including breach of contract, breach
of the duty of good faith and fair dealing, promissory
estoppel, equitable estoppel, waiver, equitable relief,
breach of fiduciary duty, and negligent misrepresentation.
Ixe I at * 5.  On MBNA's motion, the Court dismissed all
but the breach of contract claim, holding that under the
"prevention or hindrance" doctrine, MBNA's allegedly
intentional failure to timely provide documents regarding
the BOA Edge and its last-minute decision to switch funding
entities immediately before the Closing Date might have
precluded MBNA from exercising its option to terminate the
Agreement. Id. at *10.  Alternatively, the Court found
that, if Ixe Banco's allegations were true, MBNA may have

11

breached its covenant of good faith and fair dealing
(which, as the Court noted, would amount to a breach of the
underlying contract).[7] Id.

Ixe Banco now moves for summary judgment on the issue
of liability, asserting that MBNA breached the Agreement by
hindering its ability to obtain the Government Approvals
specified therein.  MBNA cross-moves seeking dismissal of
the action.

## II.   DISCUSSION

### A.   Legal Standards

Summary judgment is appropriate only where there is
"no genuine issue as to any material fact" and the moving
party "is entitled to judgment as a matter of law." Fed. R.
Civ. Proc. 56(c).  A fact is material if it could affect
the outcome of the suit. Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  A dispute is genuine if "the

---

[7] Thus, MBNA's argument that "the Court dismissed Ixe
Banco's breach of contract claim" is plainly incorrect.
(Def. Opp. Mem. 17.)  Similarly, MBNA's contention that Ixe
Banco should be precluded from arguing on the instant
motions that MBNA did not timely provide documents relating
to the BOA Edge because Ixe Banco failed "to have
identified this new allegation in both its complaint and
interrogatory responses" must be rejected because this
allegation was clearly identified in the Court's March 7,
2008 decision. (Id.); see Ixe I at *10.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Overton v. New York State Div. of Military and Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004). Where, as here, the parties file cross motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir. 1981).

    As the Court has already observed, the prevention or hindrance doctrine upon which Ixe Banco's claim is predicated "is the implied obligation not to (1) do anything which will have the effect of destroying or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent." Ixe I at *10 (citing Westerbreke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 212 (2d Cir. 2002); see also Wieder v. Skala, 80 N.Y.2d 628, 637 (N.Y. 1992) ("The idea is simply that when A and B agree that B will do something it is understood that A will not prevent B from doing it. The concept is rooted in notions of common sense and fairness")(citation omitted). Where applicable, the doctrine excuses the non-occurrence of a condition precedent if the party seeking to invoke that

13

condition "was instrumental in preventing or frustrating its occurrence." Merzon v. Lefkowitz, 735 N.Y.S. 2d 106, 107 (1st Dep't 2001). Here, application of the doctrine would prevent MBNA from relying on Ixe Banco's failure to obtain Mexican Government Approvals to terminate the Agreement, and Ixe Banco would have a claim for breach thereof. See ADC Orange, Inc. v. Coyote Acres Inc., 7 N.Y.3d 484, 490 (N.Y. 2006) (doctrine potentially applied where defendant allegedly hindered plaintiff's ability to timely obtain subdivision approval under contract at issue).

Although the prevention or hindrance doctrine is straightforward in theory, the parties dispute the doctrine's requisite elements. MBNA first argues that Ixe Banco must show that MBNA acted in bad faith to prevail. (Def. Mem. 9). However, as Ixe Banco observes, this assertion runs contrary to established law. The Court of Appeals has held that "[b]ad faith is not necessarily an essential ingredient to a finding of wrongful prevention." Trylon Realty Corp. v. Di Martini, 34 N.Y.2d 899 (1974); accord India.com v. Dalal, 412 F.3d 315, 323 n.4 (2d Cir. 2005) ("wrongful termination by the seller need not, however, mean 'bad faith'. Even 'arbitrary' terminations can be wrongful for the purpose of this rule.")

14

Accordingly, Ixe Banco need only establish that MBNA deliberately or arbitrarily frustrated its efforts to obtain Government Approvals to invoke the prevention doctrine.[8]

MBNA also contends that Ixe Banco must show that but for MBNA's alleged behavior, Ixe Banco would have satisfied all the Closing Date conditions by March 31, 2006. (Def. Mem. 14-16.)   Although it presents a closer question, this argument must also be rejected.   Defendants primarily rely on the following language from a 1927 New York Supreme Court decision:

> The general rule is unquestioned that prevention by the defendant of the performance of a condition precedent excuses the non-performance of the condition . . . it must be shown that the nonperformance was actually due to the behavior of the defendant.   If the condition would not have happened whatever the defendant's conduct, the condition is not dispensed with. (citing Williston Cont. § 677.)

---

[8] In this regard, the parties' dispute as to the motivations behind MBNA's switching funding entities is of marginal relevance.   MBNA contends, and Ixe Banco disputes, that it switched to the BOA Edge because the increased value of Ixe Banco's credit portfolio necessitated a larger initial investment that the BOA Edge was better-equipped to handle. (Pl. Counter 56.1 Stmt. ¶¶ 30, 33-34, 39-40.)   However, this professed good intention would not prevent a finding of prevention or hindrance if MBNA arbitrarily withheld information relating to its decision until it was no longer feasible for Ixe Banco to obtain Government Approvals by March 31, 2006.

Windsor Investing Corp. v. T.J. McLaughlin's Sons, 225
N.Y.S. 7, 10 (Sup. Ct. N.Y. Co. 1927), aff'd without
opinion, 229 N.Y.S. 926 (1st Dep't 1928); see also 10
Corbin on Contracts, § 947 (2009)("One who sues for
damages, alleging as a breach the prevention or hindrance
by the other party must prove that the condition on which
his rights depended would have occurred or been performed
but for the prevention or hindrance.")

However, both subsequent New York authority and
Williston (upon which the Windsor court relied) indicate
that a plaintiff need not prove the defendant actually
prevented the condition precedent from occurring so long as
the plaintiff shows the defendant's behavior substantially
hindered performance. See e.g., Farrell Heating, Plumbing,
Air Conditioning Contractors, Inc. v. Facilities Dev. and
Improvement Corp., 414 N.Y.S.2d 767, 770 (3d Dep't 1979) (a
party who "greatly disrupts and frustrates" the other's
performance breaches the underlying agreement); 13 Richard
A. Lord, Williston on Contracts, § 39.3 (4th ed. 2000 &
2009 Supp.) ("if one party to a contract hinders, prevents,
or makes impossible performance by the other party, the
latter's failure to perform will be excused.") (emphasis
added).  This approach is consistent with the doctrine's
foundation in the covenant of good faith and fair dealing

implied into every New York contract and this Court's prior
observation that "[n]ot only do parties have an obligation
not to prevent the occurrence of a condition, each party
also has an affirmative obligation to help facilitate the
other's performance." Ixe I at *10 (citing Wolff & Munier,
Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1007
(2d Cir. 1991)); see also A.H.A. Gen. Constr., Inc. v. New
York City Hous. Auth., 92 N.Y.2d 20, 31 (N.Y. 1998)
(because "[a] condition precedent is linked to the implied
obligation of a party not to do anything which will have
the effect of destroying or injuring the right of the other
party to receive the fruits of the contract . . . the
relevant inquiry is not simply one of the [defendant's] bad
faith or negligence in the performance of the contract but
additionally whether the misconduct prevented or hindered"
plaintiff from satisfying the condition) (internal
citations and quotations omitted) (emphasis added); E.
Consol. Props., Inc. v. Adelaide Realty Corp., 691 N.Y.S.2d
45, 49 (1st Dep't 1999) (where a contracting party
conditions the contract on the transfer of a title, that
party has "implicitly promised to use his good faith best
efforts to bring about this result") (quoting Stendig, Inc.
v. Thom Rock Realty Co., 558 N.Y.S.2d 917, 919 (1st Dep't
1990)).

Thus the Second Restatement of Contracts, in a provision cited with approval by the New York Court of Appeals, states that "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[9] Restatement (Second) of Contracts § 245 (1981) (emphasis added); Merrill Lynch Realty/Carll Burr, Inc. v. Skinner, 63 N.Y. 2d 590, 597 (N.Y. 1984).  According to the Restatement commentary, "[a]lthough it is implicit in the rule that the condition has not occurred, it is not necessary to show that it would have occurred but for the lack of cooperation." Id. cmt. b.  Should the plaintiff establish that defendant's behavior "materially contributed" to plaintiff's non-performance, the burden then shifts to defendant to show "that the condition would not have occurred regardless of the lack of cooperation." [1] (Id.)

Applying these principles, I conclude that to invoke the prevention doctrine under New York law, Ixe Banco must first show that MBNA materially hindered its ability to obtain the requisite Government Approvals in a timely

---

[9] I also note that the Ninth Circuit relied on this Restatement comment in a case that MBNA asserts correctly interprets New York law. Orrico v. Alliant Foodservice, Inc., 119 Fed. Appx. 899, 901 (9th Cir. 2004).

manner.  Should it meet this threshold burden, MBNA can
nonetheless show that it retained the right to exercise its
option to terminate the Agreement by demonstrating that the
Closing Date would not have occurred notwithstanding MBNA's
alleged misbehavior.

### B.   Analysis

Issues of fact in two areas preclude an award of
summary judgment on either of the instant motions.  First,
due to the conflicting evidence presented by the parties,
only the trier of fact can determine whether Ixe Banco met
its threshold burden of showing that MBNA's late-decision
to switch funding entities materially hindered Ixe Banco's
performance.  Second, even if Ixe Banco had unequivocally
met this burden, there is a genuine dispute as to whether
MBNA has established a causation defense.

### 1.   Factual Dispute as to whether MBNA prevented Ixe Banco from obtaining Government Approvals

The first genuine factual dispute concerns whether
MBNA adequately apprised Ixe Banco of its anticipated
change of funding entities months before March 31, 2006.
In this regard, Ixe Banco relies heavily on the undisputed
fact that that MBNA did not provide any documentation

regarding the BOA Edge until March 15, 2006, arguing that
this delay made it impossible to obtain approval from the
Mexican authorities by March 31, 2006. (Def.Counter 56.1
Stmt. ¶ 50.)   Ixe Banco also observes that, under the
Agreement, MBNA was obliged to "provide [Ixe Banco] with
the necessary information and documentation so that Ixe
Banco can apply for the Mexican Governmental Approvals
. . . ." (Agmt. ¶ 4(b).)

    For its part, MBNA counters that, under the Agreement,
Ixe Banco was responsible for obtaining the requisite
Mexican approvals and never requested documentation
regarding the BOA Edge even though it knew that MBNA was
planning to switch funding entities well before March 2006.
(Id.; Def. Opp. Mem. 18-19.)   To support this contention,
MBNA offers a declaration wherein Luzio asserts that
"during [her] ongoing conversations and meetings with Ixe
Banco during January and February 2006, [she] referred to
the use of [the BOA Edge] or a Bank of America Edge Act
corporation as MBNA's funding source for the proposed joint
venture instead of the MBNA Edge."[10] (Luzio Decl. ¶ 21.)

---

[10] Ixe Banco asserts that the Luzio Declaration is
inconsistent with her deposition testimony. (Pl. Reply Mem.
10-11.)   The Court fails to see the inconsistency.   Indeed,
the testimony highlighted by Ixe Banco includes Luzio's
assertion that by early February "[o]bviously we were
(cont'd on next page)

She further avers that she had conveyed this information directly to Mauricio Naranjo, Ixe Banco's Chief Financial Officer, and Julio Escandon, Ixe Banco's regulatory consultant, by early February 2006. (Id. ¶ 22). Luzio even asked them whether, in its February filing with Hacienda, Ixe Banco needed to alert Mexican authorities as to the change of funding entities, and "[b]oth Mr. Naranjo and Mr. Escandon [said] that no information regarding this process needed to be included in the second informal filing." (Luzio Reply Decl. ¶ 14.)

Finally, Luzio avers that in February and early March of 2006, she distributed weekly Project Plans to Ixe Banco personnel, including Escandon and Naranjo, which indicated that MBNA was planning to dissolve the MBNA Edge and replace it with another entity.[11] (See Luzio Decl. ¶¶ 24-25;

---

(cont'd from previous page)

informing everybody . . . we were in the process of utilizing a different Edge" (Younger Reply Decl. Ex. 84 at 184:14-16) and that she "was referencing Bank of America Edge" (id. 185:9).

[11] This assertion makes it unnecessary at this juncture to determine whether the other Ixe Banco recipients of Luzio's project plans can be deemed agents whose knowledge of the anticipated switch was properly attributable to Ixe Banco, as it is undisputed that Escandon was Ixe Banco's regulatory agent and Naranjo's status as CFO makes his knowledge imputable to Ixe Banco. (See Pl. Opp. Mem. 10.)

However, the Court notes that the parties vigorously
(cont'd on next page)

Luzio Reply Decl. ¶¶ 7-8; Def. Add'l Counter 56.1 Stmt.
¶¶ 81-82.)  These plans included entries such as "Dissolve
MBNA Edge"; "Create proper funding corporations i.e. Edge
Corp"; BAC Card Action Request in order to utilize [BOA
Edge] to invest in Mexico." (Luzio Decl. ¶¶ 24-25 & Exs. I-
J.)

    Ixe Banco replies that while it knew that MBNA had
contemplated switching funding entities, it advised against
the change and did not know that MBNA had actually decided
to use the BOA Edge until it was too late.[12]  (See Pl. Mem.
6; Pl. Opp. Mem. 1.; Younger Decl. Ex. 52.)  It also offers
affidavits from Escandon and Naranjo expressly denying that

---

(cont'd from previous page)

dispute both the scope of duties of other Ixe Banco
personnel who were undisputed recipients of the Project
Plans and how they used these Plans.  Thus even if neither
Escandon nor Naranjo received the Project Plans, a genuine
factual dispute would remain over whether the plans
constituted sufficient notice of MBNA's intentions and if
so, whether such notice is properly attributable to Ixe
Banco. (See Def. Add'l 56.1 Stmt. ¶¶ 81-108.)

[12] The primary evidence upon which Plaintiffs rely for the
proposition that Ixe Banco advised against switching Edge
entities is a somewhat ambiguous January 23, 2006 email
exchange in which Naranjo asked Luzio for "documentation of
the entity that is going to be the shareholder of the
Sofol" and Escandon responded that Ixe Banco should "follow
on the same path we had decided from the beginning" by
providing the Mexican regulators with information regarding
MBNA rather than any Edge entity "since we have no
information on the edge (and if we get it it will be
minimal)." (Younger Decl. Ex. 52; Luzio Decl. Ex. M
(English translation).

they received copies of Luzio's project plans and asserting
that they were only informed of MBNA's decision to switch
funding entities on March 14, 2006.[13] (See Younger Opp.
Decl. Ex. 58 ¶¶ 2, 7; Ex. 59 ¶¶ 3, 5.) Ixe Banco further
notes that the Project Plans took the form of massive excel
spreadsheets and none of the sparse entries upon which MBNA
relies explicitly said that MBNA had decided not to use the
MBNA Edge. (Pl. Opp. 5; see also Kimmelman Decl. Exs. W, X,
& Y.). Finally, Ixe Banco observes that Luzio knew that
Ixe Banco's February submission to Hacienda identified the
MBNA Edge as MBNA's Designee and never told Ixe Banco that
this information was incorrect. (See Pl. Reply 5; Younger
Opp. Decl. Ex. 59 ¶ 4.)

The central issue is thus whether the alleged
communications between Luzio, Naranjo, Escandon, and other
Ixe Banco personnel were sufficient to put Ixe Banco on
notice that MBNA was going to use the BOA Edge rather than
the MBNA Edge and Ixe Banco, charged under the Agreement
with obtaining the requisite approval from Mexican
regulators, was therefore obliged to seek documentation
regarding the BOA Edge prior to March 2006.  This will turn
on an assessment of the credibility of Luzio's testimony,

---

[13] Notably, neither affidavit expressly denies that Naranjo
and Escandon had conversations with Luzio regarding the BOA
Edge in January or February of 2006.

as opposed to that of Escandon and Naranjo, as well as a factual determination of the role played by Luzio's Project Plans in Ixe Banco's closing preparations.  These issues do not lend themselves to adjudication on summary judgment.[14]

Furthermore, there is a question of fact as to whether, even assuming it had no prior notice that MBNA would switch funding entities, Ixe Banco ever opposed the decision as untimely.  Luzio asserts that "Ixe Banco never objected to or questioned the use of [the BOA Edge] and never told me that the use of [the BOA Edge] would delay the regulatory approval process and make a March 31, 2006 closing impossible." (Luzio Decl. ¶ 40).  In this respect, her declaration is directly at odds with Naranjo's deposition testimony, in which he asserts that when told in March that MBNA was going to switch funding entities, he said "this was going to, in terms of the application, this

_____

[14] This determination also governs the potential applicability of Ixe Banco's proffered expert testimony. Ixe Banco offers the expert opinions of Carlos Provencio Munoz (Younger Decl. Ex. 47) and Juan Cortes Rocha (id. Ex. 48), both of whom opine that absent the last-minute change of funding entity, Ixe Banco could have obtained the requisite Government Approvals by March 31, 2006 (id. Ex. 47, at 17-18; Ex. 48, at 9).  However, Ixe Banco does not contest MBNA's observation that both opinions are predicated on the assumption that Ixe Banco was first notified of the change in mid-March of 2006. (Def. Opp. Mem. 13; Pl. Reply Mem. 8-9.)  Accordingly, the Court need not determine whether the proffered opinions should be stricken as irrelevant at this time. (See Def. Opp. Mem. 13; dkt. No 67.)

meant like starting from scratch.  It was like starting
from zero." (Younger Decl. Ex. 43, at 148:12-14.)   Luzio
asserts that even after MBNA had formally approved use of
the BOA Edge, Ixe Banco did not seek documentation
regarding that entity. (Luzio Decl. ¶ 35.)   Rather, she
collected and provided that information on her own
initiative. (Id.)  The contradictory evidence in this
regard presents another genuine factual dispute as to
whether MBNA's allegedly last-minute decision to switch
entities actually hindered Ixe Banco's ability to obtain
timely regulatory approval from Mexican authorities.

     2.   Factual dispute as to MBNA's causation defense

Even if Ixe Banco had sufficiently established that
MBNA materially hindered Ixe Banco's efforts to obtain the
requisite Government Approvals to warrant judgment as a
matter of law, questions of fact would remain as to whether
MBNA can establish a causation defense.  MBNA observes that
as of March 31, 2006, Ixe Banco had not yet approached the
Mexican Competition Commission and FIB to obtain their
approval, as required by the Agreement. (Pl. Counter 56.1
Stmt. ¶ 58.)  Nor had important transaction documents such
as the Transfer Agreement, the Ixe Banco Services
Agreement, or the MBNA Secondment Agreement been finalized

by that date. (Id. ¶¶ 66-67.)  MBNA asserts that even assuming it unduly delayed disclosure of its decision to use the BOA Edge and documentation pertinent thereto, these other conditions precedent to closing would not have been satisfied by March 31, 2006. (Def. Mem. 14-15.)  This assertion alone is not enough, however, to carry MBNA's burden.  That the other conditions were not satisfied by March 31, 2006 is not proof that they would not have been, had the requisite Government Approvals been obtained by this time.

However, MBNA has also introduced evidence indicating that Ixe Banco may have had difficulties funding the Joint Venture.  It is undisputed that over the course of 2005, the value of Ixe Banco's credit card portfolio, to be purchased for the Sofol, increased. (Def. Counter 56.1 Stmt. ¶ 30).  Nor is it disputed that Ixe Banco agreed to increase its initial capital contribution to the Sofol from the $17.5 million contemplated in the Agreement to $35 million (Kimmelman Decl. Ex. V), although the parties dispute whether this was due to the increased value of Ixe Banco's credit card portfolio (Def. Counter 56.1 Stmt. ¶ 32).  MBNA offers evidence that on March 28, 2008, the Ixe Banco Executive committee resolved to seek authorization from the Banco de Mexico "to raise USD

35,000,000" in financing" for the Joint Venture (Kimmelman Decl. Ex. CC), and that the requested authorization had not been obtained by March 31, 2006 (Id. Ex. G (Ixe Admissions No. 20)).  MBNA also offers evidence indicating that on April 4, 2006, Ixe Banco was exploring the option of funding the venture by contributing its credit card portfolio directly rather than paying cash at the outset. (Kimmelman Reply Decl. Ex. DD.)

Ixe Banco counters that the increased funding was not required to initiate the Joint Venture. (Def. Opp. Mem. 18-19.)  Furthermore, Ixe Banco asserts that it had the requisite liquidity to provide the $35 million initial capital by March 31, 2006, and that it was "ready, willing, and able" to do so. (Younger Opp. Decl. Ex. 57 (Affidavit of Javier Molinar Horcasitas, taken February 25, 2009, ¶ 3.)  This apparently contradictory evidence creates triable issues of fact as to whether the parties would have proceeded with the transaction regardless of whether Ixe Banco obtained additional financing and whether Ixe Banco would have proceeded with the transaction even without the additional funds it sought.

III. <u>CONCLUSION</u>

Accordingly, both motions for summary judgment [dkt. nos. 44 & 48] are denied.  The parties shall inform the court by letter no later than October 30 how they propose to proceed.


SO ORDERED:

Dated:    New York, New York
          September *29*, 2009


_____
LORETTA A. PRESKA
Chief U.S.D.J.